# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

NATHAN RANDOLPH,      )
                             )

     **Plaintiff,**          )
                             )

**vs.**                     )     **Case No.  6:18-cv-1271-CLS**
                             )

**NANCY A. BERRYHILL, Acting**   )
**Commissioner, Social Security**   )
**Administration,**              )
                             )

     **Defendant.**         )

## MEMORANDUM OPINION

Claimant, Nathan Randolph, commenced this action on August 9, 2018, pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner, affirming the decision of the Administrative Law Judge ("ALJ"), and thereby denying his claim for a period of disability and disability insurance benefits. For the reasons stated herein, the court finds that the Commissioner's ruling is due to be affirmed.

The court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of review is limited to determining whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and whether correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Tieniber v. Heckler*, 720 F.2d 1251, 1253

(11th Cir. 1983).

Claimant contends that the Commissioner's decision is neither supported by substantial evidence nor in accordance with applicable legal standards. Specifically claimant asserts that the ALJ: (1) made factual findings that were not supported by substantial evidence; (2) did not afford proper weight to a treating physician's opinion; (3) improperly substituted her own opinion for that of the medical experts; and, (4) improperly considered claimant's daily activities. Upon review of the record, the court concludes that these contentions lack merit, and the Commissioner's ruling is due to be affirmed.

## I. SUBSTANTIAL EVIDENCE

Claimant asserts that the ALJ's opinion was not supported by substantial evidence because she "erroneously cherry picked bits and pieces of the record to justify two flawed decisions despite overwhelming objective evidence supporting [claimant's] contention he cannot work."[1]

Claimant first challenges the ALJ's statement that "[t]he record clearly shows the claimant has undergone two lumbar spine surgeries and one cervical spine surgery; *however, his symptoms resolved postoperatively, with no significant ongoing problems evidenced in the objective medical record*."[2] Claimant asserts that his

---

[1] Doc. no. 8 (Claimant's Brief), at 12 (alteration supplied).

[2] Tr. 17 (alteration and emphasis supplied). *See also id.* at 16 ("[T]he record shows his symptoms improved postoperatively and that his condition would not affect his ambulation or in

symptoms continued, or even worsened, after each surgery. It is true that claimant's symptoms did progress after his first lumbar spine surgery on April 5, 2013,[3] necessitating a second surgery more than two and a half years later, on November 2, 2015.[4] But what occurred between claimant's first and second surgeries has little bearing on his claim, because his alleged disability onset date was not until September 1, 2015, only two months before his second surgery.[5] Thus, it was appropriate for the ALJ to focus upon claimant's functional abilities *after* his second lumbar surgery.

The ALJ noted that claimant experienced some relief after the second surgery on November 2, 2015.[6] A consultative examination performed by Dr. Kevin Goelz on December 5, 2015, revealed that claimant was able to get on and off the examination table, get into and out of a chair, and ambulate without difficulty. His gait was normal without an assistive device. Straight leg raising tests were negative. Claimant was able to walk on his toes and heels, squat to the floor and recover, tandem walk, and bend to touch his toes. He had normal grip strength, normal fine and gross manipulation skills, no evidence of muscular atrophy, full motor strength

[*sic*] his ability to perform his daily activities, as he alleged at the hearing.") (alteration supplied).

[3] Tr. 792.

[4] Tr. 906-07.

[5] *See* Tr. 11 (discussing claimant's amended onset date).

[6] Tr. 16.

in all extremities, and normal reflexes.  His range of motion in all joints was within normal limits.  Dr. Goelz concluded that claimant had "no exam findings to suggest a functional limitation" with regard to standing, sitting, walking, bending, stooping, reaching, handling, lifting, carrying, seeing, hearing, remembering, or understanding.[7] Dr. Mark Prevost, claimant's orthopedic surgeon, reported on December 16, 2015, that he had "excellent placement" of his bone graft and that he had "some improvement" of his back and leg pain.[8]  During visits to his primary care physician, Dr. Farouk Raquib, between November 17, 2015 and June 13, 2016, claimant reported that his pain was between a level 2 and 5 on a 10-point scale.  Claimant also stated that, with medication, his activity level improved 60-80%, and his overall pain level improved 70-90%.[9]

The ALJ acknowledged that claimant re-injured his back sometime in July 2016, while working in his yard.[10]  An MRI on August 10, 2016 revealed the following findings in claimant's lumbar spine:

L1-L2:  Unremarkable on sagittal images.

L2-L3:    Shallow  posterior  disc  bulge.    Moderate  facet degenerative changes.  Flattening of the ventral surface of the thecal sac. AP diameter of the central thecal sac, 11 mm.  Mild bilateral lateral

---

[7] Tr. 910-14.

[8] Tr. 946.

[9] Tr. 986, 991, 996, 1005, 1010, 1015, 1020, 1025.

[10] Tr. 16.

recess stenosis.

L3-L4: Broad-based posterior disc protrusion, eccentric to the left. Moderate facet degenerative changes. AP diameter of the central thecal sac, 5mm. Severe bilateral lateral recess stenosis. Mild bilateral foraminal stenosis.

L4-L5: Metal artifact from anterior surgical plate and screws. Interbody spacer appears to be present. Posterior disc osteophyte complex mildly impresses on the ventral surface of the thecal sac. Moderate facet degenerative changes. Lateral recesses appear moderately narrowed on the right and mildly narrowed on the left. Moderate bilateral foraminal stenosis.

L5-S1: Small, shallow, posterior disc protrusion slightly impresses the thecal sac. Moderate facet degenerative changes. AP diameter of the central thecal sac, 11 mm. Mild right and mild-moderate left foraminal stenosis.

Tr. 977-78. When Dr. Prevost reviewed those results on August 24, 2016, he stated that claimant had "a new large disc herniation causing severe bilateral lateral recess stenosis and foraminal stenosis thecal sac only," with "significant degenerative changes at this level" and "fairly significant radicular symptoms."[11] He recommended a series of three epidural steroid injections, with the possibility of an additional (third) surgery if the injections did not provide relief.[12] Claimant reported on October 17, 2016, that he did not receive significant relief from his injections, and Dr. Prevost continued to recommend surgery. Claimant informed Dr. Prevost that he wanted to

---

[11] Tr. 948.

[12] *Id.*

discuss the potential surgery with his wife, but it does not appear that claimant ever received the surgery, and Dr. Prevost's records do not contain any further notes regarding treatment for claimant's *lumbar* spine.[13] Even though the ALJ acknowledged that claimant received epidural steroid injections in his lumbar spine,[14] she did not mention Dr. Prevost's recommendation of additional surgery. That omission seems significant at first blush, but claimant's treatment records do not reflect any disabling functional limitations as a result of lumbar pain after he re-injured his back. During monthly visits to Dr. Raquib between August 9, 2016 and December 19, 2017, claimant reported pain at a level 3-5, 60-80% improvement in his overall activity level (with medication), and 70-90% improvement in his overall pain level (with medication).[15] The only exceptions were on June 5 and July 3, 2017, when claimant reported pain at a level 8.[16] Those two isolated incidents are insufficient to support a finding of disability on a continuing basis.

The ALJ also did not ignore material evidence regarding claimant's cervical impairments. A November 21, 2016 MRI revealed the following changes in

---

[13] Tr. 1069-70. To the extent claimant argues that the ALJ improperly relied upon claimant's failure to seek additional treatment for his lumbar spine because he could not afford treatment, that argument is not persuasive, because the record is clear that claimant did seek additional treatment, including surgery, for his *cervical* spine, after these dates.

[14] Tr. 16.

[15] Tr. 1034, 1039, 1081, 1086, 1095, 1101, 1109, 1158, 1164, 1169, 1175, 1180, 1185, 1199, 1204, 1209, 1214, 1219.

[16] Tr. 1190, 1194.

claimant's cervical spine:

> C5-C6:  Moderate-sized right paracentral and right lateral disc herniation is noted which appears to be impinging upon the right exiting nerve root.  Overall, it produces mild central canal and moderate-marked right foraminal stenosis.  No left foraminal stenosis is seen.

> C6-C7:  Large left paracentral and left lateral disc herniation is present which impinges upon the left exiting nerve root.  It also abuts the adjacent cord.  No right foraminal stenosis is seen.

Tr. 1077.  The ALJ acknowledged those findings, and the fact that claimant underwent surgery on November 29, 2016, to fuse his cervical vertebrae.[17]

Claimant nonetheless challenges the ALJ's finding that "[t]he record shows no evidence of any further treatment by Dr. Prevost [after the November 29 surgery], which clearly indicates his symptoms improved postoperatively."  It is true that the record does not contain any additional treatment notes from Dr. Prevost after the cervical surgery, but claimant testified that he did not return to Dr. Prevost because he lost his insurance coverage.[18]  The ALJ should have taken into account claimant's loss of insurance and inability to afford additional treatment with Dr. Prevost.  *See Dawkins v. Bowen,* 848 F.2d 1211, 1213 (11th Cir. 1988) (holding that "poverty excuses [a claimant's] noncompliance" with medical treatment) (alteration supplied).  Even so, the ALJ's failure was, if anything, harmless error.  Claimant's failure to seek

---

[17] Tr. 16-17.  *See* Tr. 1075 (discussing claimant's surgery).

[18] Tr. 83.

additional treatment from Dr. Prevost was not the sole basis for the ALJ's decision. *See Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (citing *Dawkins,* 848 F.2d at 1214) (holding that "when an ALJ relies on noncompliance as the *sole ground* for the denial of disability benefits, and the record contains evidence showing that the claimant is financially unable to comply with prescribed treatment, the ALJ is required to determine whether the claimant was able to afford the prescribed treatment.") (emphasis supplied). Moreover, claimant was not completely without medical treatment after his cervical surgery, as he did continue to see Dr. Raquib. As discussed above, claimant reported only mild to moderate pain to Dr. Raquib, and he described significant improvement in his overall pain and activity levels.

Overall, the record does not reflect that the ALJ "cherry-picked" pieces of record evidence that would support a decision to deny claimant's disability claim. To the extent that the ALJ did not explicitly discuss certain pieces of evidence, that evidence was not material to the decision.

## II. DR. PREVOST'S OPINION

Claimant next asserts that the ALJ improperly evaluated the opinions of Dr. Prevost, his orthopedic surgeon. The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (internal citations

omitted).  Good cause exists when "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Id*.  Additionally, the ALJ is not required to accept a conclusory statement from a medical source, even a treating source, that a claimant is unable to work, because the decision whether a claimant is disabled is not a medical opinion, but is a decision "reserved to the Commissioner."  20 C.F.R. § 404.1527(d).

Social Security regulations also provide that, in considering what weight to give *any* medical opinion (regardless of whether it is from a treating or non-treating physician), the Commissioner should evaluate:  the extent of the examining or treating relationship between the doctor and patient; whether the doctor's opinion can be supported by medical signs and laboratory findings; whether the opinion is consistent with the record as a whole; the doctor's specialization; and other factors.  *See* 20 C.F.R. § 404.1527(c).  *See also Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986) ("The weight afforded a physician's conclusory statements depends upon the extent to which they are supported by clinical or laboratory findings and are consistent with other evidence as to claimant's impairments.").

Dr. Prevost provided a "Sworn Statement" on August 26, 2016, during the time period when claimant had re-injured his back after his second lumbar spinal surgery,

was undergoing a series of three epidural steroid injections, and anticipated a third lumbar surgery if the injections were not effective.[19]  Dr. Prevost testified that "[t]here is no way this gentleman could work *at this point*.  And probably it's not good given the fact that he's had two surgeries and now looking at a third surgery and still has issues in his spine even if we fix that."[20]  He also testified that there was "no way" claimant would *ever again* be able to work eight hours a day at *any* job.[21]  The ALJ gave Dr. Prevost's statement little weight because it was not supported by the doctor's own records, and there was no explanation for the inconsistencies between the opinion and the records.[22]  The ALJ also stated:

> The longitudinal records of Dr. Prevost and Dr. Raquib reveal the claimant's symptoms improved with surgery, treatment, and medication. Moreover, a review of the treatment notes simply do not [*sic*] show that they ever provided the claimant with any restrictions regarding his work activity or daily activities.  Additionally, the undersigned notes that these are merely conclusory opinions with no evidence they have any specific vocational training or expertise, concerning an issue, which is reserved to the Commissioner . . . .

Tr. 19-20.

The ALJ adequately articulated her reasons for rejecting Dr. Prevost's conclusory assessment that claimant could not work, and her decision was supported

---

[19] Tr. 969-70.

[20] Tr. 972 (alteration and emphasis supplied).

[21] Tr. 973.

[22] Tr. 19.

by substantial evidence. Dr. Prevost's treatment records reveal that claimant suffered from lumbar and cervical pain that required three separate surgeries, but the mere fact that claimant had lumbar and cervical disc impairment, or even that he underwent surgery, does not establish his disability. Instead, the relevant consideration is the effect of claimant's impairment, or combination of impairments, on his ability to perform substantial gainful work activities. *See* 20 C.F.R. § 404.1505 (defining a disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"). *See also Bowen v. Yuckert,* 482 U.S. 137, 146 (1987) ("The [Social Security] Act 'defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace.'") (alteration supplied) (quoting *Heckler v. Campbell,* 461 U.S. 458, 459-60 (1983)). Dr. Prevost's records do not indicate that claimant actually suffered disabling *functional* impairments as a result of his conditions and surgeries.

### III. DR. RAQUIB'S OPINION

Claimant also argues that the ALJ improperly considered the opinion of Dr. Raquib, his primary care physician. Dr. Raquib provided a "Sworn Statement," similar to Dr. Prevost's statement, on January 15, 2018. He responded to the

questions of claimant's attorney as follows:

Q. [Claimant] cannot sit, stand, or walk for any long periods. He can only sit for maybe, at the most, 30 minutes to an hour.

A. Correct.

Q. He can only walk five to ten minutes. He can only stand for five to ten minutes. So, he can sit for 30 minutes to an hour at one time, walk for 10 to 15 minutes, and stand for only five to ten minutes, and those are obviously just estimates.
But, first of all, since you've been seeing him, whether you recorded that in your chart or not, is that consistent in substance with what he's been telling you?

A. Yes.

Q. If you take into account his findings on MRI, the residuals of these three spinal surgeries, and everything you've seen, including on physical exam, history, and the totality of your records, would those complaints be consistent with the totality of his medical problems?

A. Yes.

Q. Do you know of any way this man could complete a full-hour workday no matter how physically demanding it was?

A. No.

Q. Would he be subject to missing a lot of work if he even tried to work?

A. Yes.

Q. Over a period of, say, a year's time, how many absences a week, per week or per month would you expect him to have, even if he tried to work at all?

A.  Out of five days a week work, I would say he would miss three to four days every week.

Q.  Out of just a week?

A.  Yes.

Q.  All right.  So that would be a considerable amount of time out of a year?

A.  Yes.

Q.  Have you seen anything to indicate to you that he is a malingerer?

A.  Absolutely not.

Q.  What is his prognosis for pain?

A.  His prognosis is poor in terms of long-term functioning.  He's going to always have pain, but we may be able to manage his pain long-term with pain management.

Q.  When you say that, do you mean he can work and do everything like he used to, or is it just manageable where it's not unbearable?

A.  Manageable to do his daily ADL's, activities of daily living, mostly.

Tr. 1253 (alteration supplied).

The ALJ assigned only little weight to Dr. Raquib's testimony, providing the exact same reasoning that she did for Dr. Prevost's testimony.[23]  Claimant challenges

---

[23] Tr. 19-20.  The ALJ stated:

The longitudinal records of Dr. Prevost and Dr. Raquib reveal the claimant's

13

the ALJ's finding that Dr. Raquib never provided any restrictions on claimant's activities, and indeed, that finding is erroneous. Dr. Raquib repeatedly restricted claimant from bending, stooping, lifting more than 15 pounds, sweeping, mopping, weed eating, and any other activities involving twisting movements of the spine.[24] The Commissioner suggests that "it is manifestly inferable from the ALJ's decision that she intended to write that neither doctor restricted Plaintiff regarding his activities *to the extent attested to in their sworn declarations*."[25] There is no need to engage in any such speculation regarding the cause of the ALJ's misstatement, however, because the ALJ's error was harmless. Despite her misstatement, the ALJ went on to discuss Dr. Raquib's December 19, 2017 treatment note, which included the restrictions discussed above on lifting and postural activities. The ALJ gave great weight to Dr. Raquib's 15-pound lifting restriction, "as he has a longstanding treating relationship with the claimant," and the restriction "was also following the claimant's third spine surgery, although improved and well healed."[26] That

---

symptoms improved with surgery, treatment, and medication. Moreover, a review of the treatment notes simply do not [*sic*] show that they ever provided the claimant with any restrictions regarding his work activity or daily activities. Additionally, the undersigned notes that these are merely conclusory opinions with no evidence they have any specific vocational training or expertise, concerning an issue, which is reserved to the Commissioner . . . .

Tr. 19-20.

[24] Tr. 1110, 1159, 1165, 1170, 1176, 1181, 1186, 1191, 1195, 1200, 1205, 1210.

[25] Doc. no. 10 (Commissioner's Brief), at 13 n.6 (emphasis supplied).

[26] Tr. 20.

conclusion was mirrored in the ALJ's residual functional capacity finding, which included restrictions of frequently lifting and/or carrying up to ten pounds and occasionally lifting and/or carrying up to fifteen pounds.[27]

Aside from the immaterial discrepancy about whether Dr. Raquib had imposed activity restrictions, the ALJ articulated adequate reasons for rejecting Dr. Raquib's testimony. She reasoned that Dr. Raquib's opinions were not supported by his medical records, that there was no explanation for the discrepancies, and that Dr. Raquib was not qualified to provide a final opinion regarding whether a claimant is able to work, because that is a decision reserved to the Commissioner.[28] Those conclusions were supported by substantial evidence. As discussed above, Dr. Raquib's records include claimant's reports of only mild to moderate pain, and significant improvement in claimant's overall pain and activity levels. Dr. Prevost's records do not support any additional restrictions.

## IV. DR. MOIZUDDIN'S OPINION

Dr. Samia Moizuddin conducted a consultative examination and provided a

---

[27] Tr. 15. Claimant also makes the argument that the ALJ was wrong to "cherry pick" a single record from Dr. Raquib imposing the 15-pound lifting restriction. *See* doc. no. 8 (Claimant's Brief), at 21-22. As an initial matter, the record the ALJ relied upon was from December 19, 2017, claimant's most recent visit to Dr. Raquib before the administrative hearing, so it had particular relevance. *See* Tr. 1159. Moreover, claimant's argument does not hold up logically. Claimant argues that the ALJ's reliance upon a single record was insufficient, but the limitations imposed in the December 19 note were the same that Dr. Raquib had listed many times before. Thus, even if the ALJ had discussed "the entire treatment record," instead of just "one cherry-picked note," her conclusions would have been the same. *See* doc. no. 8 (Claimant's Brief), at 22.

[28] Tr. 19-20.

report on October 2, 2017. The clinical examination revealed that claimant was morbidly obese and had trouble getting onto and off of the examination table. He had full muscle strength in all groups, normal muscle tone, and no atrophy or abnormal movements, but he could only squat 1/4 of the way, and he could not heel and toe walk. He had numbness in both legs below his knees to his feet, and his gait was impaired with a right leg limp.[29] Range of motion was restricted in all areas of claimant's spine, but his dexterity and grip strength were normal.[30] Dr. Moizuddin concluded that claimant could never lift or carry any weight at all. He could sit, stand, and walk for only twenty minutes each at a time. He could sit for a total of four hours, stand for a total of one hour, and walk for a total of two hours in an eight-hour workday. Claimant did not require an assistive device to ambulate. He could only occasionally use his right, dominant hand for reaching, handling, fingering, feeling, pushing, and pulling. He could never use his left, non-dominant hand for reaching overhead, handling, or feeling, but he could occasionally use it for other reaching, fingering, pushing, and pulling. He could only occasionally use both feet to operate floor controls. He could occasionally climb stairs and ramps, but never climb ladders or scaffolds. He could never balance, stoop, kneel, crouch, or crawl. He had no visual or hearing limitations. He could never be exposed to unprotected heights,

---

[29] Tr. 1147.
[30] Tr. 1149-50.

moving mechanical parts, or vibrations, and he could only occasionally operate a motor vehicle and be exposed to humidity, wetness, dust, odors, fumes, other pulmonary irritants, extreme cold, and extreme heat. He could not shop, travel without a companion, use standard public transportation, prepare a simple meal and feed himself, or sort, handle, and use paper files, but he could ambulate without using an assistive device, walk a block at a reasonable pace on rough or uneven surfaces, climb a few steps at a reasonable pace with the use of a single hand rail, and care for his personal hygiene. All of claimant's limitations had lasted, or could be expected to last, twelve consecutive months.[31]

The ALJ afforded Dr. Moizuddin's assessment only little weight because Dr. Moizuddin "examined the claimant only one time and is not a treating physician," and her limitations were inconsistent with Dr. Raquib's finding that claimant was restricted to lifting fifteen pounds.[32] The only challenge claimant offers to the ALJ's finding is that the ALJ wrongfully relied upon "one cherry-picked record" from Dr. Raquib.[33] That argument is not persuasive for the reasons discussed in the previous section. This court finds that the ALJ's consideration of Dr. Moizuddin's assessment was in accordance with applicable law and supported by substantial evidence.

---

[31] Tr. 1151-56.

[32] Tr. 20.

[33] Doc. no. 8 (Claimant's Brief), at 21.

17

# V. CLAIMANT'S DAILY ACTIVITIES

Claimant's final argument is that the ALJ improperly relied upon his limited daily activities in evaluating his subjective symptoms. To demonstrate that pain or another subjective impairment renders him disabled, claimant must "produce 'evidence of an underlying medical condition and (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain.'" *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991) (quoting *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986)). "*After* considering a claimant's complaints of pain, the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence." *Marbury v. Sullivan,* 957 F.2d 837, 839 (11th Cir. 1992) (citing *Wilson v. Heckler*, 734 F.2d 513, 517 (11th Cir. 1984)) (emphasis supplied). If an ALJ discredits subjective testimony on pain, "he must articulate explicit and adequate reasons." *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing *Jones v. Bowen*, 810 F.2d 1001, 1004 (11th Cir. 1986); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986)).

The ALJ properly applied those legal principles. She found that "claimant's medically determinable impairments could reasonably be expected to cause the

alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."[34]  She also found:

> The objective medical evidence is fully consistent with the above residual functional capacity and is inconsistent with the allegations of disabling levels of pain or other symptoms the claimant has alleged. Specifically, the medical evidence is inconsistent with the symptoms or limitations of the frequency, duration, or severity to interfere with the above range of work.  As will be discussed in more detail below, the record clearly shows that the claimant's condition is stable and does not significantly affect his ability to perform work activity . . . .

Tr. 16 (record citation omitted).  To support those findings, the ALJ relied upon claimant's medical records, the treating and consultative physicians' opinions, the effects of claimant's obesity on his functional abilities, his pursuit of unemployment compensation benefits, claimant's daily activities, and the effects of his medications. Those all were permissible considerations.  *See* 20 C.F.R. § 404.1529(c).

Claimant's objections are to the ALJ's reliance upon two treatment notes from Dr. Raquib:  (1) a September 8, 2016 note that claimant was "doing well and 'he does his own yard work,'"[35] and (2) a December 19, 2017 note stating "that the claimant

---

[34] Tr. 15.

[35] Tr. 16 (quoting Tr. 1039). Claimant also disputes this note as a misunderstanding.  He testified during the administrative hearing that he reported to Dr. Raquib that he re-injured his back after slipping and stepping in a hole while showing his son what he wanted done in the yard.  Tr. 85. The ALJ acknowledged that claimant denied working in his yard, but apparently decided to nonetheless credit Dr. Raquib's statement.  *See* Tr. 16 ("At the hearing, the claimant denied telling

'is functioning well overall and able to complete his activities of daily living with minimal pain. He attends church on Sunday with good pain control.'"[36] Claimant correctly points out that the Eleventh Circuit has disavowed the notion that "participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability." *Lewis v. Callahan,* 125 F.3d 1436, 1441 (11th Cir. 1997). Indeed, it would be absurd to conclude that claimant could work full-time just because he attends church once a week. But here, claimant's personal activities were only one factor the ALJ relied upon in evaluating the consistency of claimant's subjective complaints with the entirety of the record. That was an appropriate consideration, and the ALJ's conclusion was supported by substantial evidence.

## VI. CONCLUSION

Based on the foregoing, the court concludes the ALJ's decision was based upon substantial evidence and in accordance with applicable legal standards. Accordingly, the decision of the Commissioner is due to be affirmed. A separate final judgment will be entered contemporaneously herewith.

---

the doctor he did any yard work."). Thus, any misunderstanding was irrelevant.

[36] Tr. 19 (quoting Tr. 1158).

DONE this 27th day of February, 2019.

United States District Judge